No. 23-20516

# In the United States Court of Appeals for the Fifth Circuit

GREAT LAKES DREDGE & DOCK COMPANY, L.L.C.,

*Plaintiff-Appellant*

v.

CHRIS MAGNUS, COMMISSIONER,
U.S. CUSTOMS AND BORDER PROTECTION;
ALEJANDRO MAYORKAS, SECRETARY,
U.S. DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellees*

AMERICAN PETROLEUM INSTITUTE; AMERICAN CLEAN POWER ASSOCIATES,

*Intervenor Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston District

## REPLY BRIEF OF PLAINTIFF-APPELLANT

John Longstreth
Mark H. Ruge
Tre A. Holloway
K&L GATES LLP
1601 K Street, N.W.
Washington, DC 20006
(202) 778-9000 (Tel.)
(202) 778-9100 (Fax)
john.longstreth@klgates.com
mark.ruge@klgates.com
tre.holloway@klgates.com

Beth Bivans Petronio
K&L GATES LLP
1717 Main Street, Suite 280
Dallas, Texas 75201
(214) 939-5500 (Tel.)
(214) 939-5849 (Fax)
beth.petronio@klgates.com

# **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ......................................................................................................4

I.    As CBP Has Acknowledged in This Litigation, and As API Acknowledged in Past Litigation, Great Lakes Has Standing to Challenge a CBP Ruling That Will Subject the Jones Act-Qualified Vessel It Is Building to Foreign Competition. .....................................4

    A.    Great Lakes' Standing Was Clear From the Record, and Required No Affidavit or Additional Evidentiary Support. .......7

    B.    Neither Great Lakes Nor the Government Has Forfeited Any Arguments for Standing ...............................................................8

    C.    Great Lakes' Injury Is Concrete and Particularized. ...............11

    D.    Great Lakes' Injury Is Neither Speculative Nor Hypothetical. 14

    E.    A Decision Overturning CBP's Ruling Would Redress Great Lakes' Injury. ......................................................................15

    F.    API Misconstrues Regulatory Filings and Ignores Business Realities. .....................................................................................16

II.    The Court Should Resolve The Merits of This Appeal and Confirm the Plain Meaning of OCSLA's Text. ..................................................19

    A.    The Court Can and Should Resolve the Question. ...................19

    B.    The Plain Language of OCSLA Unambiguously Covers the Seabed. ...................................................................................21

CONCLUSION ...................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*106 Mile Transp. Assocs. v. Koch*,
   656 F. Supp. 1474 (S.D.N.Y. 1987) .................................................................23

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety
   Admin.*,
   41 F.4th 586 (D.C. Cir. 2022)....................................................................8

*Barber v. Bryant*,
   860 F.3d 345 (5th Cir. 2017) ...............................................................15

*Castro v. Scanlan*,
   86 F.4th 947 (1st Cir. 2023)................................................................15

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)...........................................................................15

*Cooper v. Tex. Alcoholic Bev. Comm'n.*,
   820 F.3d 730 (5th Cir. 2016) .......................................................15, 16

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 1994) ...............................................................23

*Frere v. Lee*,
   No. 99-cv-601, 2000 WL 64297 (E.D. La. Jan. 26, 2000) .................10

*Halverson v. Slater*,
   206 F.3d 1205 (D.C. Cir. 2000)............................................................3

*Hardt v. Reliance Standard Life Ins. Co.*,
   560 U.S. 242 (2010).............................................................................4

*Irwin v. Veterans Admin.*,
   874 F.2d 1092 (5th Cir.1989) ...............................................................7

*Kent Int'l Inc. v. United States*,
   2023 WL 2624177 (C.I.T. Mar. 24, 2023) ..........................................6

*Kloosterboer Int'l Forwarding LLC v. United States*,
604 F. Supp. 3d 853 (D. Alaska 2022) ................................................. 6

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
754 F.2d 1223 (5th Cir. 1985) ........................................................... 22

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) (en banc) ............................................ 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................ 7

*Ocwen Loan Servicing, L.L.C. v. Berry*,
852 F.3d 469 (5th Cir. 2017) ............................................................ 10

*P. Gas Transmission Co. v. FERC*,
998 F.2d 1303 (5th Cir. 1993) ........................................................... 16

*Rivera v. Wyeth-Ayerst Lab'ys*,
283 F.3d 315 (5th Cir. 2002) ............................................................ 11

*Sierra Club v. E.P.A.*,
292 F.3d 895 (D.C. Cir. 2002) ............................................................ 7

*Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*,
69 F.2d 330 (5th Cir. 1978) ............................................................. 22

*Tropical Cruise Lines, S.A. v. Vesta Ins. Co.*,
805 F. Supp. 409 (S.D. Miss. 1992) ................................................. 10

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
412 U.S. 669 (1973) ........................................................................... 17

*Watson v. City of Allen*,
821 F.3d 634 (5th Cir. 2016) ............................................................ 21

*Wirth Ltd. v. S/S Acadia Forest*,
537 F.2d 1272 (5th Cir. 1976) ........................................................... 16

**Statutes**

19 U.S.C. § 1625(c) ..................................................................6

19 U.S.C. § 1625(c)(1)-(2) .......................................................6

43 U.S.C. § 1333(a)(1)(A) .................................................3, 13

43 U.S.C. § 1333(a)(1)(A) (i) .........................................19, 21

**Other Authorities**

19 C.F.R. § 177.1(a)(1) ............................................................5

19 C.F.R. § 177.12(c) ...............................................................6

99 Cong. Rec. 6962 (1953) .....................................................24

H.R. Rep. No. 1031 (1953) .....................................................24

S. Rep. No. 411 (1953) ............................................................24

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The opening briefs of Petitioner Great Lakes Dredge and Dock ("Great Lakes") and of the Government Respondents ("CBP") lay out clearly and succinctly why the vessel Great Lakes is building in a U.S. yard, which would face foreign competition if CBP's ruling is not reversed, is not too "hypothetical" to give Great Lakes standing, contrary to the district court's decision. CBP's brief makes clear that it had all the information it needed to rule on Great Lakes' ruling request. Undisputed facts in the administrative record demonstrate that CBP was fully aware that Great Lakes' scour rock transportation vessel was already under construction, and that CBP's ruling would allow foreign vessels to compete with Great Lakes' new vessel. Thus, CBP's ruling was timely and necessary, and Great Lakes has Article III standing under abundant precedent applying the well-established doctrine of competitor standing. Great Lakes and CBP are in full agreement on this point. This Court should summarily reverse the district court's ruling and set the case for argument on the merits.

Defendant-Intervenor American Petroleum Institute (API), which concocted out of whole cloth the argument that Great Lakes lacks standing, nonetheless continues to press the point. However, API itself, in litigation raising broader issues, conceded that a party such as Great Lakes that sought and received a Customs Letter ruling on a proposed transaction would have Article III standing to challenge that

1

ruling.  API even cited Great Lakes' complaint in this very case as an example of a party properly pleading standing.  *See* Ex. A. at 4.

API tries to hide its temporizing behind a flurry of false allegations that Great Lakes somehow misled the agency as to its plans.  But when CBP issued its ruling it knew exactly what Great Lakes was planning, *see, e.g.*, ROA.1735, and had no trouble determining that Great Lakes' plans were concrete and real enough to support a ruling.  When API made these same arguments to the district court, CBP noted that it had the proper information before it and knew how to seek additional information if needed.  ROA.1810 n.4.

API also tries to divert attention from Great Lakes' unquestionable standing by arguing at considerable length about an alternative basis for standing—that the ruling will apply to "identical transactions" in the future—and asserting that Great Lakes waived reliance on this alternative ground.  This is untrue; Great Lakes expressly stated in its complaint and argued to the district court that its plans to build a second vessel in a U.S. yard were dependent on the outcome of this litigation.  *See* ROA.10-11, ROA.18 (Complaint ¶¶ 3, 7, 32).  Moreover, even the vessel under construction will likewise be negatively impacted in future transactions identical to that addressed in the letter ruling.  CBP agrees that this is another basis for standing, and in any event, given that Great Lakes has standing based on CBP's response to Great Lakes' request regarding the vessel already under construction, API's

argument is beside the point. While API is obviously eager to avoid a ruling on the merits, its standing arguments are entirely without basis as a matter of both fact and law, and no less so because the district court adopted one of them. *See, e.g., Halverson v. Slater*, 206 F.3d 1205, 1212 (D.C. Cir. 2000) (holding that arguments the district court had accepted nonetheless were objectively unreasonable when contrary to "the easily ascertainable plain meaning of one provision [of a statute]").

CBP also concedes that this Court can decide on the merits the pure question of law presented in this appeal and offers no reason why the Court should not do so. CBP Br. at 24. API, consistent with its interest in continued delay as to a ruling on the merits, argues that the matter should return to the district court for a ruling on this purely legal issue, which would then surely be appealed *de novo* by the losing party back to this Court. API's suggested course would serve neither judicial economy nor the public interest.

On the merits, CBP's ruling is contrary to the easily ascertainable plain meaning of the provision of the Outer Continental Shelf Lands Act (OCSLA) that unambiguously extends the jurisdiction of the United States to the "subsoil and seabed of the outer Continental Shelf." 43 U.S.C. § 1333(a)(1)(A). The statute nowhere mentions the "pristine" seabed, or supports CBP's effort to rewrite it to include this concept. CBP and API fight against the plain language of the statute, even though the Supreme Court has instructed time and again that any question of

3

statutory interpretation must start with the plain language, and very often must end there as well. *See, e.g., Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) ("[W]e begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose . . . We must enforce plain and unambiguous statutory language according to its terms.") (cleaned up). CBP itself recognized this plain meaning before a lobbying campaign by API prevailed upon the agency to change its mind. *See* Great Lakes' Br. at 5–6. This Court should direct CBP to do so again, so that scour rock is carried to the outer Continental Shelf (OCS) by U.S-flagged, -built, and -crewed vessels as Congress intended.

## **ARGUMENT**

### I.     **As CBP Has Acknowledged in This Litigation, and As API Acknowledged in Past Litigation, Great Lakes Has Standing to Challenge a CBP Ruling That Will Subject the Jones Act-Qualified Vessel It Is Building to Foreign Competition.**

In its opening brief, Great Lakes unquestionably demonstrated its standing to challenge the agency's rulings that permit foreign-flagged vessels to transport scour protection rock between two U.S. points, and CBP agrees. *See* Great Lakes' Br. at 16–28; CBP Br. at 18–23. Great Lakes squarely alleged that this foreign competition will harm its business by reducing its market share and exerting downward price pressure on the services it provides, in violation of the Jones Act, which protects the domestic shipping industry in which Great Lakes is a major participant. ROA.10-

11, ROA.18 (Complaint ¶¶ 3, 7, 32).  The record unquestionably demonstrates that Great Lakes is actively investing in a Jones Act-qualified vessel, which has been under construction for eight months.  *See* ROA.582-84, 1739-42 (noting the agency's awareness of the vessel and its construction schedule, and that the President of the United States attended the steel-cutting ceremony for the vessel).  Construction of that vessel is underway, and the company is actively competing for contracts to employ the vessel upon its completion.  Under the well-established doctrine of competitor standing, a party has standing to challenge government action that causes direct economic harm when a statute entitles that industry member to reduced competition.  *See* Great Lakes' Br. at 16–28.  The agency's rulings directly threaten Great Lakes' legally protected economic interests, placing this case squarely within the competitor standing doctrine.  *Id.*

Although CBP did not expressly take a clear position on the issue in the district court, the agency now fully agrees that Great Lakes has standing, acknowledging that its ruling letter inflicts a cognizable injury-in-fact on Great Lakes by permitting foreign companies to compete with the vessel that Great Lakes is currently building to carry scour protection rock from points in the U.S. to the OCS.  CBP Br. at 18–19.  CBP acknowledges that, because the agency's ruling is binding with respect to "prospective transactions," 19 C.F.R. § 177.1(a)(1), and "identical" transactions occurring in the future, *id.* § 177.9(b)(4), the ruling directly

impacts Great Lakes' business by exposing the company's new vessel to foreign competition.[1] This is consistent with the agency's regulations as to its rulings, which aim to provide clarity *before* regulated entities undertake expensive transactions. *See* CBP Br. at 21–22. Forcing companies to take actions such as completing construction of a vessel before challenging rulings that directly threaten their potential business would undermine the very purpose of CBP ruling letters, as the agency explains in detail. *Id*.

Even API, the only party currently arguing against standing, has admitted in related litigation that Great Lakes has standing to bring this very challenge. *See* Ex. A at 4. In litigation to which Great Lakes was not a party, API filed a brief challenging the standing of its counterparty in that lawsuit, an association seeking to challenge a number of CBP rulings affecting its members. *See id.* In arguing that the party in that case lacked standing, API held up Great Lakes as an example of how to establish standing, citing the complaint filed by Great Lakes in the district

---

[1]    The cited regulations partially implement 19 U.S.C. § 1625(c), which provides that CBP cannot take action that would (1) "modify" "or revoke a prior interpretive ruling or decision that has been in effect for 60 days; or (2) have the effect of modifying the treatment previously accorded by the [CBP] to substantially identical transactions" unless it modifies or revokes those rulings after notice and comment. 19 U.S.C. § 1625(c)(1)–(2). CBP's line of letter rulings regarding the pristine seabed constitute a "treatment," under the statute and 19 C.F.R. § 177.12(c), and thus are also binding on the agency for "substantially identical" transactions. *See Kloosterboer Int'l Forwarding LLC v. United States*, 604 F. Supp. 3d 853, 873 (D. Alaska 2022); *see also Kent Int'l Inc. v. United States*, 2023 WL 2624177, at *4–6 (C.I.T. Mar. 24, 2023) (discussing how long-enforced letter rulings applied nationwide qualify as treatments). This is yet another basis for standing in this case.

court proceedings currently under review in this very appeal. Acknowledging the agency's authority to issue ruling letters as to both "prospective" and "identical transactions," API's brief accused the other party of seeking an "advisory opinion," suggesting it would have standing had it only proceeded in the manner that Great Lakes has here. *See id.* API's expedient change of position in this case notwithstanding, API knows full well that Great Lakes has standing, just as the government does.

### A. Great Lakes' Standing Was Clear From the Record, and Required No Affidavit or Additional Evidentiary Support.

In response to a summary judgment motion challenging a plaintiff's standing, the plaintiff "must 'set forth' by affidavit *or other evidence* 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. Rule Civ. Proc. 56(e)) (emphasis added). In other words, "[t]o defeat a factual attack, a plaintiff . . . is "obliged to submit facts *through some evidentiary method* to sustain his burden of proof." *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir.1989) (quoting *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015)) (emphasis added).

As the D.C. Circuit has observed, "[i]n many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it." *Sierra Club v.*

*E.P.A.*, 292 F.3d 895, 899–900 (D.C. Cir. 2002). Thus, "the lack of an affidavit is not fatal to [a party's] standing because a petitioner may also support standing with evidence in the administrative record." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 593–94 (D.C. Cir. 2022).

API argues that Great Lakes "defaulted" on its obligation to show standing, claiming that by not providing affidavits to confirm what was already in the record Great Lakes somehow forfeits the case. API Br. 33. Not so. Great Lakes more than sufficiently established its standing based on the administrative record, supported by the allegations in its complaint. CBP had ample information regarding Great Lakes' business model, its reliance on the Jones Act, and the specific vessel under construction. *See* ROA.215-19, 582-87. API identifies no additional facts beyond the record that were necessary to evaluate standing; it simply argues incorrectly that Great Lakes was required to provide an affidavit repeating those facts. Indeed, as the government stated in the district court, the agency could have requested additional clarification during the proceedings if needed, but it concluded the record was fully sufficient to issue its ruling. *See* ROA.1810 n.4. There was no need for an affidavit to establish Great Lakes' standing.

## B. Neither Great Lakes Nor the Government Has Forfeited Any Arguments for Standing

Seeking additional technicalities on which to prevail, API next accuses both Great Lakes and the government of forfeiting certain arguments related to standing,

even though Great Lakes previously addressed API's arguments with detailed legal argumentation and citations to abundant precedent. *See* ROA.1690-96. Great Lakes expressly alleged that it was planning to build another U.S.-flag vessel, thus invoking the "identical transactions" ground of standing as an alternative basis. *See* Complaint ¶¶ 3, 7. ROA.10-11. API's arguments related to waiver and forfeiture are therefore meritless. No standing argument was forfeited.

A brief summary of the procedural history is instructive. In the district court, Great Lakes, the company directly impacted by CBP's ruling and the party actively constructing a vessel for the specific purpose of operations subject to the ruling it sought, appealed a ruling letter issued to Great Lakes itself. *See* ROA.9-35. As the primary stakeholder, it was plain from the outset that Great Lakes has a vested interest in challenging the ruling's impact on its business. The government never questioned Great Lakes' standing at the agency level, and never even hinted at a standing argument to the district court. Nor did API profess any confusion before the agency as to what Great Lakes was planning. *See* ROA.155-59 (API submission reflecting full awareness of Great Lakes' interest in the ruling).

No hint of any doubt as to Great Lakes' interest in this matter was raised until API made a standing argument as an intervenor in the district court. *See* ROA.1056-64. CBP addressed API's arguments on the point only in a footnote in its summary judgment papers, without adopting API's position or arguments in any way.

ROA.1810 & n. 4.  CBP noted that under its regulations it "issues ruling letters 'on the assumption that all of the information' about the particular transaction or issue in the ruling letter request 'is accurate and complete in every material respect.'"  *Id.* (quoting 19 C.F.R § 177.9(b)(1)). If the proposed transaction described in the ruling-letter request is "incomplete or insufficiently described," the agency may request additional information and provide an opportunity to correct any deficiencies.  *Id.* (citing 19 C.F.R § 177.3).

With the government effectively conceding Great Lakes' standing, the logical course was to focus on the pivotal issue at hand: the agency's interpretation of the relevant statutes.  Both Great Lakes and the government rightfully prioritized addressing the substantive legal questions surrounding the ruling.  While Great Lakes responded to API's arguments on standing with detailed legal counterpoints, the issue of standing seemed not to be seriously in dispute.[2]

Finally, even if this Court were to find some standing argument had not been properly presented, it would have discretion to reach this purely legal issue that requires no additional factual development.  *See Ocwen Loan Servicing, L.L.C. v.*

---

[2] Indeed, it was not clear that the district court would even consider an argument pressed only by API, since generally an intervenor "cannot change the issue that is framed between the original parties and must join subject to the proceedings that have occurred prior to his intervention; he cannot unring the bell."  *Tropical Cruise Lines, S.A. v. Vesta Ins. Co.*, 805 F. Supp. 409, 412 (S.D. Miss. 1992); *see also Frere v. Lee*, No. 99-cv-601, 2000 WL 64297, at *1 (E.D. La. Jan. 26, 2000) ("[A]n intervenor cannot change the issues framed by the parties . . .").

*Berry*, 852 F.3d 469, 472 (5th Cir. 2017) (court has "discretion to reach" unpreserved "purely legal issue") (citing *New Orleans Depot Servs., Inc. v. Dir., Office of Worker's Comp. Programs*, 718 F.3d 384, 387–88 (5th Cir. 2013)); *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002) (standing is a question of law subject to de novo review). Addressing all relevant arguments at this stage would ensure judicial efficiency and avoid the unnecessary expenditure of further proceedings on standing.

### C. Great Lakes' Injury Is Concrete and Particularized.

In its opening brief, Great Lakes demonstrated that its injury is both "concrete" and "particularized," as required to establish standing, because CBP's ruling directly threatens Great Lakes' economic interests, which are specifically protected by the Jones Act. Great Lakes' Br. at 16–28. The Jones Act aims to bolster the domestic shipping industry by restricting certain maritime activities to US-built, owned, and crewed vessels. This protection creates a well-defined market that Great Lakes operates in and relies on for its business success. CBP's ruling undermines this protection by allowing foreign-flagged vessels to compete in the coastwise trade. Far from being generalized or abstract, these harms represent a specific disruption of the legal framework and a tangible threat to the economic viability of a vessel Great Lakes is building specifically to compete in this protected market. *See id.*

CBP agrees that its ruling letter impacts the competitive landscape in a way that tangibly affects Great Lakes' business interests. The agency states that "[t]he increased competition from foreign-flagged vessels that CBP's Ruling Letter permits for the initial phase of such projects is a sufficiently concrete and imminent injury to give Great Lakes standing." CBP Br. at 20–21. Because "Great Lakes has shown that it owns a coastwise-qualified vessel slated for completion in sufficient time to perform work" on projects governed by CBP's ruling letter, the agency acknowledges Great Lakes' standing to seek review of its ruling. CBP Br. at 19.

In arguing otherwise, API cites four cases in support—none of which address a party's standing to challenge administrative action, and none of which were cited to or relied on by the district court in its decision. API Br. at 35–39. *Lee v. Verizon* concerned the standing of a defined-benefit plan participant to sue for alleged violations of the Employee Retirement Income Security Act (ERISA). 837 F.3d 523, 530–31 (5th Cir. 2016). The Court's holding in *Lee*—that the retirement plan participants lacked standing because there was no likelihood the alleged statutory violation would cause the plan to default and thus injure them—has no relevance to this case where the statutory violation will cause direct competitive harm to Great Lakes. The other cases on which API relies are similarly irrelevant. *Campaign Legal Center v. Scott*, a case brought by civic engagement organizations who alleged

an "informational injury" but "identified no 'downstream consequences' from failing to receive the required information," is far afield from this case where, as CBP has conceded, Great Lakes will suffer a direct competitive injury from the agency's ruling. 49 F.4th 931, 936–37 (5th Cir. 2022). *Federal Crop Insurance Corp. v. Merrill* does not concern standing or administrative agencies, and API's cherrypicked quote concerning parties turning "square corners" when applying for government insurance benefits again bears no relationship to the facts here. 332 U.S. 380 (1947). In this case, the government has no qualms with the squareness of Great Lakes' corners, leaving only API running circles around the obvious.

Finally, while *United States v. Mead* at least did concern customs rulings, its holding concerned the level of deference courts should give such rulings regarding the substance of statutory interpretation, not standing, and thus it likewise has no application here, 533 U.S. 218, 235 (2001).[3] API has cited no authority of any persuasive value in support of its assertion that Great Lakes did not establish the concrete and particularized injury necessary to satisfy Article III standing.

---

[3] To the extent *Mead* is relevant to this case, *Mead*'s holding confirms that CBP's letter ruling deserves no deference in its interpretation of "subsoil and seabed of the outer Continental Shelf." 43 U.S.C. § 1333(a)(1)(A).

**D. Great Lakes' Injury Is Neither Speculative Nor Hypothetical.**

Great Lakes' vessel, under construction and expected to be operational by 2025, will face competition from foreign-flagged vessels if CBP's ruling stands. Because the ship is under construction with a clear operational timeline, there is nothing speculative or hypothetical about it or its ability to transport scour protection rock. The progress on this identified vessel underscores the reality of the threatened harm, making the threat of competition from foreign-flagged vessels a pressing concern.

Contrary to API's arguments, this theory of competitor standing is not speculative or hypothetical. As the First Circuit has explained, "[t]he logic of the economic competitor standing doctrine is 'firmly rooted in the basic law[] of economics' that one direct competitor's gain of market share is another's loss." *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023) (quoting *United Transp. Union v. Interstate Com. Comm'n*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989)). If a plaintiff can show "that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit," that showing suffices to establish competitor standing because the doctrine is "premised on the [plaintiff's] status as a direct and current competitor whose bottom line may be adversely affected by the challenged government action." *Castro*, 86 F.4th at 954 (quoting *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002)). To make this

showing, "a plaintiff need not show 'currently realized economic loss.'" *Castro*, 86 F.4th 947, 955 (quoting *Adams v. Watson*, 10 F.3d 915, 921–22 (1st Cir. 1993)).

Great Lakes established in its opening brief that it has standing to challenge the agency's regulatory decision because it faces potential illegal competition, even though its ship is not yet in service. Great Lakes cited abundant authority, entirely overlooked by the district court, establishing that a party does not need to wait for harm to occur before seeking a ruling to prevent that harm. Great Lakes' Br. at 25–27. These harms are real and imminent, not speculative or hypothetical, and are no less real simply because they will occur in the future. As this Court has noted, "[f]uture injuries can provide the basis for standing," when those injuries are "certainly impending" and therefore constitute injury in fact." *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017) (quotation marks and citation omitted). Indeed, the case law does "not . . . require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Instead, courts may find "standing based on a 'substantial risk' that the harm will occur . . ." *Id.*

### E. A Decision Overturning CBP's Ruling Would Redress Great Lakes' Injury.

"In . . . competitor-standing cases, where an economic actor challenged an agency's lifting of a regulatory restriction on competitors, courts have held that reintroduction of the regulatory restriction can redress the injury." *Cooper v. Tex.*

*Alcoholic Bev. Comm'n.*, 820 F.3d 730, 738 (5th Cir. 2016).   There exists "no requirement" in such cases that the affected market participant show that it "will acquire monopoly power" if the restriction is lifted.   *Id.*; *see also P. Gas Transmission Co. v. FERC*, 998 F.2d 1303, 1307 (5th Cir. 1993) (noting that a party "alleged particularized injury in its position as a traditional . . . competitor, and a favorable decision by this court would provide a remedy for that injury.").

If this Court upholds the Jones Act's application to scour protection rock transport, then Great Lakes' American-flagged vessel would no longer face foreign competition, thus achieving the core purpose of the Jones Act: to "protect and develop American merchant marine, shipbuilding, seamen." *Wirth Ltd. v. S/S Acadia Forest*, 537 F.2d 1272, 1280 n.32 (5th Cir. 1976).   The challenged ruling permits foreign-flagged vessels to compete against coastwise-qualified vessels to transport scour protection rock between coastwise points.   Reversing the ruling would directly redress the harm by ensuring that only coastwise-qualified, American-flagged vessels are eligible for scour protection rock transport, eliminating foreign competition and aligning with the Jones Act's protective mandates for the domestic maritime industry.

### F.  API Misconstrues Regulatory Filings and Ignores Business Realities.

API next contends that Great Lakes' public statements and regulatory filings undermine its standing.   API Br. 48–52.   This argument manipulates and

mischaracterizes these filings, and ignores the reality that the CBP ruling creates significant long-term risk for a company deeply reliant on the Jones Act.

API argues that Great Lakes should have referenced the agency proceedings under "Legal Proceedings" on its Form 10-K, a filing submitted annually to the Securities and Exchange Commission ("SEC"), an agency uninvolved in the current dispute. API Br. at 51. From this preoccupation with the format of an SEC form, API jumps to the flawed conclusion that Great Lakes considers the threat "immaterial and merely incidental to its business." API Br. at 51. This line of reasoning is demonstrably wrong and a transparent attempt to obfuscate the real issue. API points to no specific SEC regulation to support this reading of the Form 10-K requirements or offer any other support for its position. Even if it were correct about SEC filing requirements, and it is not,[4] the matter would be irrelevant. The issue here is standing to challenge an agency's statutory interpretation, not SEC filing requirements. And even if API's mischaracterization of the SEC filing were correct, standing has no materiality requirement. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (holding that "an identifiable trifle is enough for standing").

---

[4]    Legal proceedings for audit and disclosure purposes generally refer to claims *against* the reporting party, for which the company may incur liabilities—not claims brought by the reporting party.

Moreover, it is obvious from even the briefest review of the SEC filing that API has seriously, and likely willfully, mischaracterized it.  Great Lakes disclosed to investors that its business model depends heavily on "Section 27 of the Merchant Marine Act of 1920 (the "Jones Act")," which operates in tandem with other legislation to "provide significant barriers to entry with respect to foreign competition" and to "prohibit foreign-built, chartered or operated vessels from competing in the U.S."  ROA.1268.  That filing noted that the Jones Act "require[s] vessels engaged in dredging in the navigable waters of the United States to be documented with a coastwise endorsement, to be owned and controlled by U.S. citizens, to be manned by U.S. crews, and to be built in the United States."  ROA.1270.  In a section of that form requiring a "summary" of risks to the entity's business, Great Lakes noted that if the Jones Act "were modified or repealed," the company's business might be in jeopardy.  ROA.1273.

Great Lakes further alerted investors that certain "interest groups" sought to introduce foreign competition into the American coastwise trade, and that "continued efforts may be made to modify or repeal the Jones Act or other federal laws currently benefiting U.S. flag vessels."  ROA.1282.  Great Lakes emphasized to its investors that any success by these interest groups "could result in significantly increased competition and have a material adverse effect on our business, results of operations, cash flows or financial condition."  ROA.1282.

Of course, API is one such "interest group," and as Great Lakes' opening brief noted, its lobbying campaign directly led to CBP reversing its proper interpretation of the plain meaning of the statute to serve API's interest in allowing foreign competition into Jones Act trades. *See* Great Lakes' Br. at 6. As CBP itself notes, API's entire campaign reflects its recognition that Jones Act operators are harmed, and foreign vessel interests aided, if API's position prevails. *See* CBP Br. at 19. The Court should see through API's charade of a standing argument and recognize that Great Lakes has a sufficiently concrete interest in shielding its vessel from non-Jones Act compliant foreign competition and safeguarding its market position from foreign entrants.

## II. The Court Should Resolve The Merits of This Appeal and Confirm the Plain Meaning of OCSLA's Text.

### A. The Court Can and Should Resolve the Question.

Great Lakes and other regulated entities have waited since February 12, 2020, for a definitive answer to the legal question presented by this case. Due first to delays at the agency level, and then to months-long delays imposed by the district court's scheduling order, this matter has languished for years in limbo without providing an answer to the question: do the words of OSCLA extending U.S. jurisdiction to the "subsoil and seabed of the outer Continental Shelf" mean what they say? *See* 43 U.S.C. § 1333(a)(1)(A)(i). In the meantime, CBP has cited its

erroneous legal position as precedent in cases raising similar issues. *See* CBP Br. at 12 n.2.

Each day that passes without a decision on this pure question of law, CBP's application of its erroneous position becomes further entrenched. This not only harms the parties in the present case, but risks cascading confusion and injustice in future cases involving similarly regulated entities. Businesses cannot confidently shape their affairs within an uncertain legal landscape. This Court's swift review and resolution of the purely legal question before it is vital to ensure the just and predicable application of the law.

This Court, not the district court, is best positioned to provide the answer. Statutory interpretation is the bread and butter of appellate courts, and all parties have extensively briefed the issue. Further delay would serve no purpose. A remand would only add another layer of unnecessary proceedings, followed by the near certainty of another appeal to this Court. This Court can end this cycle and provide the clarity that regulated entities deserve by resolving this purely legal issue now. Neither API nor the government provides any sound reason why the record is not ripe for decision.

Fortunately, as even CBP acknowledges, when a legal question "was briefed, but not decided, in the district court," the Court of Appeals "may reach the issue as a matter of discretion." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296

(5th Cir. 2020) (en banc); CBP Br. at 24 (noting the Court's "discretion" to decide the merits here).   When a district court dismisses a case based on the threshold question of standing without reaching remaining issues that "have been fully briefed" and that present "question[s] of law subject to de novo review," this Court has discretion to consider those issues "in the first instance." *Watson v. City of Allen*, 821 F.3d 634, 640 (5th Cir. 2016) (deciding issues not passed on by the district court on review of district court's dismissal based on standing). This Court indisputably has the power to dispense with an unnecessary remand and definitively address the central legal issue.  It should do so here.

## B. The Plain Language of OCSLA Unambiguously Covers the Seabed.

The Court can resolve the merits of this case by looking to the plain meaning of the statutory text and applying traditional tools of statutory construction. *See* Great Lakes Br. at 29–51.  This case hinges on the interpretation of a few words in OCSLA's jurisdictional provision—namely that OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to "the subsoil and seabed of the outer Continental Shelf."  43 U.S.C. § 1333(a)(1)(A)(i). But as Great Lakes explained in its opening brief, and as CBP initially held before reversing itself, the plain text of this clause extends federal law "to the physical subsoil and seabed of the OCS."  ROA.256.  The first delivery of rock from a U.S. coastwise point to the seabed of the OCS represents transportation between two

points in the United States, because it goes from one U.S. coastwise point (where the rock is loaded) to a second U.S. coastwise point (the "subsoil and seabed" of the OCS).

CBP's only real response on this point is to repeatedly cite *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 69 F.2d 330 (5th Cir. 1978), in which this Court held that OCSLA did not confer jurisdiction over ship wreckage lying on the seafloor. CBP Br. at 17, 25, 26, 27, 30, 31, 33, 34, 35, 38, 40, 42, 43. As Great Lakes pointed out in its opening brief, at 35 n.4, *Treasure Salvors* supports Great Lakes' position, not CBP's or API's. As this Court explained in *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223 (5th Cir. 1985), *Treasure Salvors* turned on the fact that "the exercise of political jurisdiction over a wrecked vessel would not in any way have furthered" the "purpose of controlling the exploration of natural resources on the Continental Shelf." 754 F.2d at 1227 n.4. By contrast, the statute ***did*** apply to the oil and gas platform in *Laredo* because that work, like Great Lakes' here, "involve[d] a necessary step" in the exploitation of natural resources. *Id.* The *Laredo* case—applying OCSLA to an oil and gas platform based on its natural resource function—strengthens Great Lakes' case. It lends no support to CBP's. By the same token, the opposite result in *Treasure Salvors*—that OCSLA ***does not*** apply to ship wreckage—has no relevance to this case at all.

Other cases similarly highlight this distinction. *EP Operating Ltd. P'ship v. Placid Oil Co.,* 26 F.3d 563, 570 (5th Cir. 1994) held that OCSLA **does apply** to the construction of an oil pipeline, natural gas pipeline, an offshore platform, and related process facilities because these activities "would affect the efficient exploitation of resources from the OCS…"  By contrast, *106 Mile Transp. Assocs. v. Koch*, 656 F. Supp. 1474, 1482 (S.D.N.Y. 1987), held that OCSLA and the Jones Act **do not apply** to sewage sludge dumping sites off the coast of New York "which are wholly unrelated to the development of natural resources in the seabed of the Continental Shelf."

Great Lakes addressed this line of case law in its opening brief and showed why these cases provide no support for CBP's position.  Great Lakes' Br. at 35. Specifically, because "this case relates to the development of energy resources on the OCS, it falls squarely within OCSLA jurisdiction, and cases declining to apply federal laws to the OCS where no such energy-exploitation purpose" do not contradict Great Lakes' reading of the statute.  Great Lakes' Br. at 35 n.4.  This case concerns vessels that deposit loads of rock on the bottom of the ocean (the seabed) as a foundation for turbines that will harness the power of wind energy (a natural resource).  OCSLA applies with full force to the facts of this case, even within the limitations CBP urges.

CBP's and API's additional responses on the merits are unavailing. Both strain against the plain "seabed" statutory language in OCSLA, instead reading into Section 1333 the word "pristine" that: 1) does not exist anywhere in the statute or legislative history; and 2) gives the statute a different meaning from its plain words. Similarly, CBP incorrectly tries to discount repeated statements in the legislative history confirming the plain meaning as "stray statements," and does not explain why it can read the statute contrary to its plain meaning as a result. *See* CBP Br. at 40.[5]

CBP claims that Great Lakes' interpretation would make the whole OCS a coastwise point, but that is a false reading of how the Jones Act works. OCSLA "extends . . . U.S. laws," including the Jones Act, to the "subsoil and seabed of the OCS." A point on the OCS becomes a coastwise point for purposes of the Jones Act when merchandise intended to develop natural resources is unloaded onto it from

---

[5] *See* 99 Cong. Rec. 6962–63 (daily ed. June 22, 1953) (statement of Sen. Guy Cordon, chairman of the Committee on Interior and Insular Affairs and principal sponsor of the bill) ("I call to the attention of the Members of the Senate the fact that the jurisdiction declared embraces the seabed and subsoil as an entity…"). *See also* S. Rep. No. 411, at 23 (1953) (Conf. Rep.) ("[T]he committee determined to extend jurisdiction over the whole of the seabed and subsoil, *as well as* to operational structures."); H.R. Rep. No. 1031 (1953) (Conf. Rep.) ("[T]he jurisdiction and control of the United States is extended to the seabed and subsoil of the entire outer Continental Shelf adjacent to the shores of the United States instead of merely to the natural resources of the subsoil and seabed as in the original House version *and* also to the structures for their development, such as artificial islands, drilling platforms, etc.") (emphasis added).

another coastwise point. And that is the way the Jones Act works, and has worked, for more than 100 years at points on any of the tens of thousands of miles of coastline in the United States, and that is the way it works, and has worked, on the seabed of the territorial sea, by CBP's own rulings, and without the limitation to natural resource development. *See* CBP brief at 6 ("CBP has therefore treated maritime locations within the territorial sea as coastwise points for purposes of the Jones Act…"). There is no requirement for a "first layer" *anywhere* in the Jones Act, and there is nothing in the language of OCSLA to suggest that this "first layer" approach should apply on the OCS. The plain language of OCSLA provides that a coastwise movement is performed when a vessel moves merchandise for an OCSLA purpose between a coastwise point and the seabed of the OCS, as U.S. law (including the Jones Act) applies to the seabed.

Finally, CBP suggests that a plain reading of the statute might interfere with international obligations, and API raises the specter of violations of the General Agreement on Tariffs and Trade. *See* CBP Br. at 42–43, API Br. at 63. Great Lakes dealt with these points in its opening brief, at 44–46, and need not repeat the discussion here. The notion that application of the Jones Act to the "pristine" seabed would cause some kind of international incident, but application once a "first layer" is added to the seabed does not, is absurd on its face in any event, and the administrative record does not contain a shred of support for it.

## **CONCLUSION**

API's standing argument is entirely without merit, as CBP concedes, and this Court should consider this case on the merits.  The plain text of OCSLA, the purpose of the statute, and relevant case law and legislative history squarely support Great Lakes' interpretation.  This Court should reverse the district court's judgment and confirm that the Jones Act prohibits foreign-flagged vessels from carrying scour protection rocks between two U.S. coastwise points, including the seabed of the OCS.  A swift decision would uphold the statute as written, provide much-needed clarity to regulated entities, and prevent further entrenchment of CBP's erroneous interpretation.

Respectfully submitted,

By: */s/* Beth Bivans Petronio

**Beth Bivans Petronio**
Texas State Bar No. 00797664
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, TX 75201
(214) 939-5500 (Tel.)
(214) 939-5849 (Fax)
beth.petronio@klgates.com

John Longstreth
Mark H. Ruge
Tre A. Holloway
**K&L GATES LLP**
1601 K Street, N.W.
Washington, DC 20006
(202) 778-9000 (Tel.)
(202) 778-9100 (Fax)
john.longstreth@klgates.com
mark.ruge@klgates.com
tre.holloway@klgates.com

**ATTORNEYS FOR PLAINTIFF-
APPELLANTS GREAT LAKES
DREDGE & DOCK COMPANY, LLC**

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Times New Roman, a proportionally-spaced typeface, in 14-point font for the text and footnotes.

*/s/Beth Bivans Petronio*
**Beth Bivans Petronio**
**Counsel of Record for Plaintiff-Appellant**
**Great Lakes Dredge & Dock**
**Company LLC**

Dated:  March 29, 2024

## <u>ECF CERTIFICATION</u>

I, Beth Bivans Petronio, certify that (1) no privacy redactions were required under 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document that I retained; and (3) this document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.


*/s/Beth Bivans Petronio*
**Beth Bivans Petronio**
**Counsel for Plaintiff-Appellant**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.


*/s/Beth Bivans Petronio*
**Beth Bivans Petronio**

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPTAIN PAUL RADTKE, OFFSHORE MARINE SERVICE ASSOCIATION, and SHIPBUILDERS COUNCIL OF AMERICA, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES CUSTOMS AND BORDER PROTECTION, AN AGENCY OF THE DEPARTMENT OF HOMELAND SECURITY, and TROY MILLER, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection, | ) ) ) ) ) ) ) Civil Action No. 17-2412 (TSC) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| AMERICAN PETROLEUM INSTITUTE, | ) ) |
| Intervenor Defendant. | ) ) |

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

# <u>TABLE OF CONTENTS</u>

Table of Contents ...................................................................................................... i

Table of Authorities .................................................................................................. ii

Introduction .............................................................................................................. 1

Argument .................................................................................................................. 2

    I.    Plaintiffs' Response makes clear that they are seeking an advisory opinion rather than resolution of a particular case or controversy—the Court has no jurisdiction to entertain Plaintiffs' claims. ..................................................................................................... 2

        A.    CBP publishes letter rulings to address particular transactions, not general issues. .... 2

        B.    Plaintiffs' generalized complaint about CBP's effect on the market differs from a competitor's specific complaint about a particular transaction. ........................................... 5

        C.    Plaintiffs' claims are not ripe because they have not sought a CBP letter ruling on transactions involving their members. ................................................................................... 11

    II.    The applicable statute of limitations runs from the time a cause of action *first* accrues—it does not toll for alleged continuing harms as Plaintiffs suggest.  The statute of limitations therefore also bars the bulk of Plaintiffs' claims. ................................................................ 12

    III.    It would be futile to permit Plaintiffs to amend their Complaint yet again. ................. 14

Conclusion .............................................................................................................. 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arnoldi v. Bd. of Trs., Nat'l Gallery of Art*,
   557 F. Supp. 3d 105 (D.D.C. 2021), *aff'd*, No. 21-5182, 2022 WL 625721
   (D.C. Cir. Mar. 1, 2022) ........................................................................................13

*Functional Music, Inc. v. FCC*,
   274 F.2d 543 (D.C. Cir. 1958) ..............................................................................13

*Hallissey v. Am. Online, Inc.*,
   No. 99-CIV-3785, 2009 WL 2222739 (S.D.N.Y. July 15, 2009) ...........................15

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
   238 F. Supp. 2d 174 (D.D.C. 2001) .......................................................................14

*Horizon Lines, LLC v. United States*,
   414 F. Supp. 2d 46 (D.D.C. 2006) ...................................................................4, 7, 8

*Justice v. Koskinen*,
   672 F. App'x 6 (D.C. Cir. 2016) ............................................................................13

*Kloosterboer Int'l Forwarding LLC v. United States*,
   604 F. Supp. 3d 853 (D. Alaska 2022) ...............................................................9, 10

*Miss. Ass'n of Cooperatives v. Farmers Home Admin.*,
   139 F.R.D. 542 (D.D.C. 1991) ...............................................................................15

*Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior*,
   270 F.3d 957 (D.C. Cir. 2001) ...............................................................................12

*Mwani v. Al Qaeda*,
   600 F. Supp. 3d 36 (D.D.C. 2022) .........................................................................15

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ...............................................................................................11

*NLRB Union v. Fed. Labor Rels. Auth.*,
   834 F.2d 191 (D.C. Cir. 1987) ...............................................................................12

*Shipbuilders Council of America v. United States*,
   868 F.2d 452 (D.C. Cir. 1989) ...........................................................................8, 13

*White v. Wash. Metro. Area Transit Auth.*,
   303 F. Supp. 3d 5 (D.D.C. 2018) ...........................................................................15

*Xenophan Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC,*
268 F. Supp. 3d 61 (D.D.C. 2017) ..............................................................14

**Statutes**

19 U.S.C. § 1625 ..........................................................................................4, 5, 13

19 U.S.C. § 1625(c) ..............................................................................................2

19 U.S.C. § 1625(c)(1) ..........................................................................................4

19 U.S.C. § 1625(c)(2) ....................................................................................4, 13

28 U.S.C. § 2401(a) ......................................................................................11, 12

**Other Authorities**

19 C.F.R. § 177.1 ................................................................................................13

19 C.F.R. § 177.1(a)(1) ....................................................................................2, 5

19 C.F.R. § 177.2(b)(1) ....................................................................................6, 7

19 C.F.R. § 177.2(b)(2)(B)(iv) ............................................................................7

19 C.F.R. § 177.9 ................................................................................................13

19 C.F.R. § 177.9(a) ..............................................................................................3

19 C.F.R. § 177.9(b) ..............................................................................................3

19 C.F.R. § 177.9(b)(4) ..........................................................................1, 3, 4, 7

19 C.F.R. § 177.9(c) ..............................................................................................3

19 C.F.R. § 177.12 ..........................................................................................4, 13

19 C.F.R. § 177.12(b) ............................................................................................4

19 C.F.R. § 177.12(c)(1)(ii) ..................................................................................4

U.S. Const. art. III .......................................................................................*passim*

## **INTRODUCTION**

Plaintiffs Radtke, Offshore Marine Service Association, and Shipbuilders Council of America still cannot point to a concrete injury, fairly traceable to Customs and Border Protection ("CBP"), and redressable by this Court. Their allegations fail because they misstate the core nature of CBP letter rulings. CBP issues letter rulings to address particular transactions, not to decide general "issues." Letter rulings govern and are "applied only with respect to *transactions* involving operations *identical to* those set forth in the ruling letter." 19 C.F.R. § 177.9(b)(4) (emphases added). Thus, the withdrawal or putative withdrawal of a letter ruling likewise impacts only the particular transaction or "identical" transactions. *Id.*

CBP regulations instruct market participants not to generally rely on prior letter rulings as decisions of "issues." Regulated entities should instead seek a new letter ruling particular to their transaction. Plaintiffs skipped that critical step. They did not ask CBP for a letter ruling on a transaction involving one of their members (and they did not contemporaneously challenge any rulings issued to a third person). And Plaintiffs do not plead facts establishing that one or more members engaged or sought to engage in "identical" transactions to those described in the challenged letter rulings. Vacating the challenged letter rulings, either directly or indirectly by vacating the 2019 Decision, would not redress the injuries Plaintiffs allege. Plaintiffs do not present a case or controversy to the Court but instead seek an advisory opinion on pure "issues" of law. Article III does not permit this.

Nor does the applicable statute of limitations permit tardy challenges to old rulings on old transactions. For the reasons set forth below and in Defendants' Memorandum in Support of Defendants' Motion for Judgment on the Pleadings, the Court should dismiss Plaintiffs' Amended Complaint. And it should do so without subjecting Defendants—or the Court itself—to the unnecessary expense of litigating unsalvageable claims.

# ARGUMENT

**I.** **Plaintiffs' Response makes clear that they are seeking an advisory opinion rather than resolution of a particular case or controversy—the Court has no jurisdiction to entertain Plaintiffs' claims.**

In responding to Defendants' ripeness challenge, Plaintiffs inadvertently admit the central defect of their claims: they ask the Court for an advisory opinion on issues of law untethered from any particular case or controversy that injures them. Plaintiffs assert that "[t]he issues here involve a purely legal question with no need for any further factual development or additional agency action: whether the CBP letter rulings currently in force conflict with the Jones Act." ECF. No. 61, Pls.' Mem. Of P&A in Opp'n to Mot. for J. on the Pleadings at 34 (May 4, 2023) ("Opp'n"). But because Plaintiffs are not subject to any "currently in force" letter ruling, this Court lacks jurisdiction under Article III. The Court cannot issue the advisory opinion that Plaintiffs seek.

The core defect in Plaintiffs' claims derives—at least in part—from their mischaracterization of CBP letter rulings. CBP publishes letter rulings to address particular transactions, not general issues. Plaintiffs' reliance on competitor standing caselaw therefore misses the point. Plaintiffs' claims fail because they ask the Court to change how CBP approaches certain "issues" going forward rather than change the treatment of any particular past transaction (or "identical" transaction) in a letter ruling. Plaintiffs therefore do not present the Court with a justiciable case or controversy. They seek an advisory opinion.

## A. CBP publishes letter rulings to address particular transactions, not general issues.

Plaintiffs incorrectly assert that "once CBP issues a letter ruling *on a particular issue*, it is statutorily bound to adhere to that position in future letter rulings . . . ." Opp'n 4 (citing 19 U.S.C. § 1625(c)) (emphasis added); *accord id.* 11–12. CBP's regulations state that its letter rulings interpret the law and facts "with respect to *a specifically described transaction*." 19 C.F.R.

§ 177.1(a)(1) (emphasis added).  But CBP's letter rulings do not resolve "issues" generally.  They address particular transactions.

Plaintiffs' mistake comes from reading only a portion of the applicable regulation.  Plaintiffs rely on 19 C.F.R. § 177.9(a)'s statement that a CBP letter ruling "represents the official position of the Customs Service with respect to the particular transaction or issue described therein and is binding on all Customs Service personnel in accordance with the provisions of this section until modified or revoked."  *See* Opp'n 3 (quoting 19 C.F.R. § 177.9(a)), 13 (same).  But Plaintiffs need to read on.  Proceeding to subsection (b), the regulation elaborates on the "[a]pplication of rulings to transactions."   Subsection (b)(4) states that for "[c]arrier rulings"—which are specifically at issue here—"[e]ach ruling letter setting forth the applicability of the navigation laws to a vessel will be applied only with respect to *transactions* involving operations *identical to* those set forth in the ruling letter."  19 C.F.R. § 177.9(b)(4) (emphases added).

Letter rulings thus "bind" CBP only "with respect to any *transaction identical to the facts and circumstances* described in the ruling request."  *Id.* (emphasis added).  It is simply incorrect to say that past CBP letter rulings bind CBP to a position on an "issue"—past CBP letter rulings bind CBP only with respect to *identical transactions*.  *Id.*; *see also* ECF No. 59-1, Mem. of P&A in Supp. of Defs.' Mot. for J. on the Pleadings at 18–19 (Mar. 20, 2023) ("Mot.").  Hence, applicants may cite past letter rulings "as authority in the disposition of *transactions* involving *the same circumstances*."  19 C.F.R. § 177.9(a) (emphases added).  But parties may not rely on past letter rulings as general statements of law or policy.  CBP regulations state in no uncertain terms: "no other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter."  *Id.* § 177.9(c).

Contrary to Plaintiffs' argument, § 1625's notice-and-comment procedures do not confer general precedential effect on CBP letter rulings. Rather, § 1625 confirms the transaction-specific nature of CBP letter rulings and CBP's appropriate implementation of its authority. It requires CBP to publish notice and solicit public comment only when its proposed action would deviate from its interpretation in a letter ruling of "*identical*" transactions or "treatment" of "*substantially identical transactions*." 19 U.S.C. § 1625(c)(1), (c)(2) (emphasis added); 19 C.F.R. § 177.12 (emphasis added). CBP does not have to go through the notice-and-comment process when a subsequent letter ruling is distinguishable. 19 U.S.C. § 1625(c)(1), (c)(2); 19 C.F.R. § 177.12. And CBP must assess on a "case-by-case" basis whether a particular transaction is "*identical*" to a transaction previously treated by a CBP carrier letter ruling or "*substantially identical*" to a previous "treatment." 19 C.F.R. § 177.12(b), (c)(1)(ii); *see also id.* § 177.9(b)(4). While the Plaintiffs are stuck on challenging general "issues" of "pure law," the statute and regulations are instead about particular "identical transactions."

Now having had two chances to plead their complaint, Plaintiffs did not come forward and identify any transactions that were "identical" to those in the challenged letter rulings and that Plaintiffs or their members were considering or competing for. Instead, Plaintiffs challenge thirty letter rulings writ large without describing a particular identical transaction. Mot. 7–9 (listing challenged letter rulings). Because letter rulings are transaction-specific, Plaintiffs should have initiated or intervened in a letter-ruling request for a transaction involving one of their members— that would at least have given them a starting point for presenting a case or controversy to the Court. *Cf.* Complaint, *Great Lakes Dredge & Dock Co., LLC v. Magnus*, No. 4:22-CV-02481 (S.D. Tex. Aug. 26, 2022) (challenging a CBP letter ruling on a wind-farm transaction allegedly involving plaintiff's vessel) ("*Great Lakes* Complaint"); *Horizon Lines, LLC v. United States*, 414

F. Supp. 2d 46, 49 (D.D.C. 2006) (challenging CBP letter ruling in favor of a competitor to a particular transaction after intervening in letter-ruling proceedings). And contrary to Plaintiffs' assertion, Jones Act shippers can request letter rulings on live, prospective transactions. *Compare* Great Lakes Complaint (Jones Act Shipper requested letter ruling on a transaction that it represented it would participate in), *with* Opp'n 35.

But Plaintiffs did not even take that minimal first step toward standing. Instead, they skipped CBP entirely on the false premise that CBP determines "issues." CBP provides the public notice so that those who truly are pursing "identical transactions" have an opportunity to comment before letter rulings are modified or rescinded. That process does not dispose of the "identical transactions" requirement, and it certainly does not give the public writ large an injury-in-fact, fairly traceable, and redressable by legal challenge to each and every letter ruling. Because Plaintiffs do not plead transactions "identical" to any of the challenged rulings, they ask the Court for an advisory opinion to direct CBP to resolve those "issues" differently in the future. That is not how CBP's transaction-specific letter rulings work.[1] And that is certainly not how Article III works.

### B. Plaintiffs' generalized complaint about CBP's effect on the market differs from a competitor's specific complaint about a particular transaction.

Plaintiffs attempt to salvage their standing by emphasizing the competitive harms allegedly imposed on their members, and they rely on "competitor standing" to support that theory of harm. The notion of "competitor standing," however, offers Plaintiffs no recourse. Plaintiffs do not allege even one instance in which a CBP letter ruling on a particular transaction exposed Plaintiffs'

---

[1] 19 U.S.C. § 1625 ("substantially identical transactions"); 19 C.F.R. §§ 177.1(a)(1) ("specifically described transaction"), 177.9(a) ("transactions involving the same circumstances"), 177.9(b)(4) ("transactions involving operations identical to those set forth in the ruling letter" and "identical transaction"), 177.12 ("substantially identical").

members to unlawful competition. Instead, Plaintiffs revert to their generalized grievance that their members "have operated in a market in which the challenged rulings have permitted illegal competition." Opp'n 34.

Plaintiffs state that they "identified specific transactions that OMSA members observed being performed by foreign-flagged vessels on the [outer continental shelf] in violation of the Jones Act and cited specific instances in which OMSA members have been passed over for contracts in favor of foreign-flagged vessels in violation of the Jones Act." *Id.* 29. They give two examples:

> One OMSA member (Hornbeck) noted, "[d]ays after CBP decided to withdraw [its] notice without revoking the unlawful letter rulings," it "was advised that the client had decided to hire a foreign vessel instead." [Am. Compl.] at ¶ 153.
>
> OMSA members Candy Fleet, L.L.C, Nautical Solutions, and Otto Candies, LLC describe how they were "passed over for contracts related to the construction and maintenance of offshore facilities as a result of CBP's unlawful letter rulings and interpretative guidance." *Id.* at ¶ 156; *see also id.* Exs. 31, 32, 37 (declarations).

*Id.* 26. But Plaintiffs do not connect these two "specific" examples to any CBP letter ruling. Plaintiffs do not allege that they, their members, or anyone else sought letter rulings in advance of any of these transactions. Am. Compl. ¶¶ 153–62. They also omit key details about these transactions from their allegations: for example, where the offshore work occurred, whether they offered a vessel that was technically qualified, whether the vessel was available to meet project requirements in a timely manner, and whether the customer had other options for performing the work such that the Jones Act did not even apply (such as transporting materials from Mexico). *Id.* For example, in the Hornbeck instance, Plaintiffs give no substantive detail about the transaction beyond the fact that it was "a contract to perform offshore transport operations." *Id.* ¶ 153.

Critically, these are exactly the sort of details that CBP's regulations *require* from those making "[e]ach request for a ruling." 19 C.F.R. § 177.2(b)(1). The request "must contain a

complete statement of all relevant facts relating to the transaction," including "the names, addresses, and other identifying information of all interested parties (if known); the port or place at which any article involved in the transaction will arrive or be entered," and "a description of the transaction itself, appropriate in detail to the type of ruling requested." *Id.* "If the transaction involves a vessel, the request for a ruling should include," *inter alia*, "the place of build and nationality of registration" and "the exact place or places of intended use, if known." *Id.* § 177.2(b)(2)(B)(iv). And, where, as here, "the request for a ruling involves a determination as to whether or not the primary object of a contemplate voyage would be considered to be coastwise transportation":

> The request should completely identify the voyage, including the proposed time of arrival at and departure from every port on the itinerary and any coordination of the voyage with special events at coastwise ports, and should be accompanied by samples, if available, of brochures, advertising, and other information that may be relevant to a determination of the primary object of the proposed voyage.

*Id.*

Plaintiffs' vague allegations fall far short of any commensurate detail for any transactions that they or their members sought to engage in or compete for. They do not even allege enough facts to determine whether the alleged transactions even implicated the Jones Act at all. *See* Am. Compl. ¶¶ 153–62. They certainly do not allege facts sufficient to show that those transactions were "identical" to the transactions underlying any of the thirty challenged letter rulings and so putatively affected by them. *See* 19 C.F.R. § 177.9(b)(4) ("Each ruling letter setting forth the applicability of the navigation laws to a vessel will be applied only with respect to ***transactions*** involving operations ***identical to*** those set forth in the ruling letter." (emphases added)). Plaintiffs therefore cannot claim any alleged harms even indirectly traceable to CBP and redressable by vacatur of its rulings—whether through the thirty letter rulings themselves or through the 2017

Notice or 2019 Decision.  Plaintiffs' attempt at specificity in the Amended Complaint merely adds some color to their generalized market complaints.

The contrast between this case and *Horizon Lines, LLC v. United States*—on which Plaintiffs hang their hat—further demonstrates the intractable standing defects in Plaintiffs' claims.  *See* Opp'n 24.  In *Horizon*, the plaintiff intervened in a particular CBP proceeding to challenge a specific letter ruling.  This ruling allowed a competitor to transport frozen fish from Alaska to Massachusetts via New Brunswick.  414 F. Supp. 2d 46, 49 (D.D.C. 2006).  The *Horizon* plaintiff competed for the specific business at issue in the letter ruling.  *Id.*  Indeed, the court distinguished the *Horizon* plaintiff from the trade association plaintiff in *Shipbuilders Council of America v. United States* on that very basis.  *Id.* 43 (citing 868 F.2d 452 (D.C. Cir. 1989)).  The court noted that the *Shipbuilders* plaintiff, "a trade association[,] . . . was not party to [CBP's] original ruling" and that "the complaint was not based on any agency action adverse to plaintiff." *Id.* (citing *Shipbuilders*, 868 F.2d at 455–56).

Here, Plaintiffs do not allege that they or their members were party to administrative proceedings for any of the thirty challenged letter rulings.[2]  Am. Compl ¶¶ 70–144.  Instead, they allege only that Plaintiff OMSA later commented on subsequent notices from CBP and that their members were "passed over" in unrelated transactions—transactions that Plaintiffs make no effort to show were "identical."  *Id.* ¶¶ 37, 52, 63, 145–72; Opp'n 29.  Plaintiffs in this case do not

---

[2] Plaintiffs note that they "raised the letter rulings at issue in Count 2 in a 2016 request for a letter ruling" that CBP denied.  Opp'n 41 (citing Am. Compl. ¶¶ 193–94).  Oddly, Plaintiffs do not appeal CBP's denial of their 2016 request in any of their five claims here.  *See* Am. Compl. ¶¶ 186–209.

resemble the *Horizon* plaintiff—they instead resemble the *Shipbuilders* plaintiff that the *Horizon* court distinguished.[3]

The distinction between the *Horizon* plaintiff and Plaintiffs here confirms that key elements of Plaintiffs' standing are missing. Plaintiffs' failure to show identical transactions means they do not show that any alleged competitive harms suffered by their members are fairly traceable to these CBP rulings. Plaintiffs tellingly do not allege that they sought or that CBP issued a letter ruling governing any of the specific instances of competitive harm they identify. Am. Compl ¶¶ 70–144. The fact that Plaintiffs' members "observed" foreign-flag activity or were "passed over" by third parties cannot be fairly traced to the particular CBP letter rulings at issue. Relatedly, vacating the challenged letter rulings—either by vacating the rulings themselves or vacating the 2019 Decision which did not revoke them—would not redress Plaintiffs' alleged injuries. Plaintiffs do not allege that they or any of their members were a party to any of the thirty challenged letter rulings. *Id.* And they do not allege that any of the thirty challenged letter rulings governed "identical" transactions in which Plaintiffs' members were "harmed." *Id.* ¶¶ 145–72. Vacating the challenged letter rulings would not change Plaintiffs' current situation in any way.

*Kloosterboer*, cited by Plaintiffs, also offers a helpful distinction between this case and particularized competitive injuries. *Kloosterboer Int'l Forwarding LLC v. United States*, 604 F. Supp. 3d 853 (D. Alaska 2022). In *Kloosterboer*, CBP penalized the plaintiff for using foreign-flag vessels to transport frozen fish from Alaska to Canada and thereon to Maine, without complying with an applicable exception to the Jones Act. *Id.* 859–60. The plaintiff sued CBP to enjoin its enforcement action. *Id.* In opposing the injunction, CBP noted—using language quoted

---

[3] Indeed, one of the Plaintiffs here, Shipbuilders Council of America, was the plaintiff in *Shipbuilders*.

by Plaintiffs here—that an injunction would not be in the public interest. CBP said that the plaintiff's unlawful use of non-coastwise qualified ships "harmed several U.S.-based shipping companies" and reduced "investment" in "other U.S. industries, such as the rail and trucking industries." U.S. Opp'n to Pls.' Mot. for TRO at 41, *Kloosterboer Int'l Forwarding LLC v. United States*, No. 3:21-cv-00198-SLG, 2021 WL 5028308 (D. Alaska Sept. 20, 2021), ECF No. 38.

Thus, unlike Plaintiffs here, CBP in *Kloosterboer* described specific competitive harms in the context of a specific CBP proceeding and tied the harms directly to a particular transaction: the plaintiff's unlawful use of foreign-flag ships in the transportation of frozen fish between specified points when the record indicated that qualified U.S.-flag vessels were available for the exact movements of frozen fish at issue. *See id.* Here, Plaintiffs allege harms in transactions unconnected to the challenged CBP letter rulings, and they do not allege any specific transactions authorized by the challenged letter rulings. Am. Compl. ¶¶ 145–72. Plaintiffs merely allege general competitive and market harms unconnected to any particular CBP enforcement action. *Id.*

It is also worth noting that CBP raised the competitive and market harms in *Kloosterboer* as part of a public-interest analysis when opposing an injunction. Thus, CBP was presenting that evidence for the court's general consideration of equity. CBP did not claim that those competitive harms were concrete and particularized harms sufficient to confer standing on the affected third parties. U.S. Opp'n at 41, *Kloosterboer*, 2021 WL 5028308.

In short, Plaintiffs have failed to allege an injury that is actual and imminent, concrete and particularized, fairly traceable to the CBP letter rulings at issue, and redressable by their vacatur by this Court. *See* Mot. 17–25. They do not have standing.

**C. Plaintiffs' claims are not ripe because they have not sought a CBP letter ruling on transactions involving their members.**

For essentially the same reasons that Plaintiffs fail to allege an Article III injury, they also fail to present ripe claims or claims cognizable under the APA. *See supra* Part I.B; *see also* Mot. 25–31. Plaintiffs have skipped a critical step in the administrative process: asking CBP for a letter ruling on a particular transaction. Plaintiffs instead came straight to the Court seeking an advisory opinion to constrain CBP in future letter rulings.

Ripeness is particularly important in this context. As explained above, CBP carrier letter rulings govern only "identical transactions." *See supra* Part I.A. The fact-intensive nature of each potential Jones Act dispute heightens the need to reduce "the scope of the controversy . . . to more manageable proportions" and to "flesh out[]" "its factual components." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). CBP regularly receives ruling requests from parties with substantially similar facts because vessel owners understand, unlike Plaintiffs, that rulings apply only to "identical transactions."[4] Plaintiffs misunderstand the nature and effect of CBP letter rulings when they assert that "[t]he issues here involve a purely legal question with no need for any further factual development or additional agency action." Opp'n 34. Each CBP letter ruling depends on the facts particular to the transaction—as do any potential effects each letter ruling may have on other particular identical transactions. By abstracting "a purely legal question" from a series of letter rulings, Plaintiffs have cut out the actual case or controversy. Article III does not allow that.

---

[4] Compare, e.g., CBP HQ H329630 (Mar. 9, 2023), CBP HQ H318628 (Jun. 30, 2022), and CBP HQ H321256 (Nov. 2, 2021), all of which deal with similar—but not identical—cable lay and burial operations.

II.  **The applicable statute of limitations runs from the time a cause of action *first*
     accrues—it does not toll for alleged continuing harms as Plaintiffs suggest.  The
     statute of limitations therefore also bars the bulk of Plaintiffs' claims.**

Plaintiffs ask the Court to ignore the six-year statute of limitations governing their claims.
Section 2401(a) of Title 28 plainly says that "every civil action commenced against the United
States shall be barred unless the complaint is filed within six years after the right of action first
accrues." 28 U.S.C. § 2401(a).  Plaintiffs filed their original complaint on November 9, 2017.  The
statute of limitations thus bars any of Plaintiffs' claims that accrued before November 9, 2011.
Twenty-seven of the thirty challenged letter rulings were issued before November 9, 2011.  The
statute of limitations thus bars Plaintiffs' challenge to every letter ruling except HQ H205655
(Mar. 20, 2012), HQ H225102 (Sept. 24, 2012), and HQ H235242 (Nov. 15, 2012).[5]

Plaintiffs nevertheless ask the Court to ignore the plain language of § 2401(a).  Plaintiff
asserts that an agency's "rules and regulations are capable of continuing application."  Opp'n 38
(quoting *Murphy Expl. & Prod. Co. v. Dep't of Interior*, 270 F.3d 957, 857–59 (D.C. Cir. 2001)).
There are two problems with this theory.  *First*, Plaintiffs do not challenge a "rule" or "regulation"
of CBP—they challenge CBP's transaction-specific applications of its rules and regulations in
specific letter rulings.  *Second*, § 2401(a) plainly states that the limitations period runs from the
time "the right of action *first* accrues."  28 U.S.C. § 2401(a) (emphasis added).

Plaintiffs wrongly rely on caselaw presenting as-applied challenges to statutes or
regulations in subsequent enforcement proceedings to circumvent the phrase "first accrues."  For
example, Plaintiffs cite to *NLRB Union*.  But they omit the key phrase: "A challenge of this sort

---

[5] Of course, Plaintiffs do not challenge the latter two letter rulings themselves but instead the 2019
Decision's recission of them.  The point, however, remains the same—only these three letter
rulings fall within the applicable statute of limitations.  And regardless Plaintiffs cannot show any
actual, imminent, concrete, or particularized harm from the 2019 Decision.

might be raised, for example, by way of defense in an enforcement proceeding." *Compare NLRB Union v. Fed. Labor Rels. Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987), *with* Opp'n 38–39. Here, Plaintiffs have not challenged CBP's past letter rulings in a particular enforcement proceeding or identical action. Again, Plaintiffs were not parties to these letter-ruling requests. Instead, they bring freestanding claims affirmatively attacking the letter rulings separate from other particular transactions. Tolling the statute of limitations for all agency actions that have an "ongoing" effect would write the phrase "first accrues" out of the statute entirely. Indeed, it would effectively repeal the statute of limitations itself.

Plaintiffs also state that "Defendants' statute-of-limitations argument ignores the fact that CBP's § 1625 reconsiderations have repeatedly addressed—within the six-year limitations period—the issues covered in these letter rulings, and even, in several instances, the very same letter rulings themselves." Opp'n 40. Here Plaintiffs repeat the error highlighted above: CBP's letter rulings address particular "transactions" not "issues." *See supra* Part I.A (citing 19 U.S.C. § 1625(c)(2); 19 C.F.R. § 177.1, 177.9, 177.12). Plaintiffs' statement that CBP revisited "the issues covered in these letter rulings" simply misstates the function of letter rulings. Regardless, even if CBP revisited "issues" or "in several instances, the very same letter ruling themselves," the statute-of-limitations clock would not restart. The tolling principle quoted by Plaintiffs "applie[s] to rules and regulations," not every type of agency action as Plaintiffs suggest. *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958); *but see* Opp'n 40. Plaintiffs challenge CBP letter rulings, *not* CBP rules or regulations. Plaintiffs' attempt to lodge a challenge to stale letter rulings in the 2019 Decision lacks any foundation in law.

Plaintiffs also did not substantively respond to Defendants' explanation that challenges to letter rulings of purely historical interest are moot. *Compare* Opp'n 42–43, *with* Mot. 34. Instead,

they merely observe that the letter rulings are unrevoked. They do not even attempt to address the clear holding from *Shipbuilders* that disputes over letter rulings can become moot—"precedential effect aside"—when they have "become a matter of purely historical interest, with no present real-world consequences." 868 F.2d at 456. Plaintiffs' failure to develop any response to this point forfeits their opposition to it. *Arnoldi v. Bd. of Trustees, Nat'l Gallery of Art*, 557 F. Supp. 3d 105, 119 (D.D.C. 2021), *aff'd*, No. 21-5182, 2022 WL 625721 (D.C. Cir. Mar. 1, 2022) (holding that plaintiff forfeited a theory of liability by failing to address it); *see also Justice v. Koskinen*, 672 F. App'x 6 (D.C. Cir. 2016) ("[A]ppellant has waived the mootness argument by failing to develop in his brief."); *Xenophan Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 268 F. Supp. 3d 61, 72 (D.D.C. 2017); *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2001).

Whether on statute-of-limitations grounds or mootness grounds, the Court should dismiss Plaintiffs' untimely challenge to the old letter rulings.

## III.   It would be futile to permit Plaintiffs to amend their Complaint yet again.

The Court should not grant Plaintiffs leave to amend their Complaint again. Doing so would only unjustly delay resolution of this case. Five years and a day ago, Defendants initially moved for judgment on the pleadings on jurisdictional grounds highlighting essential defects in Plaintiffs' theory of the case. ECF No. 18-1. Defendants have still not cured those essential jurisdictional defects despite opportunity (and their attempt) to do so.

Contrary to their assertion, Opp'n 44, Plaintiffs' amendments did not merely address the intervening 2019 Decision. In fact, Plaintiffs alleged jurisdictional facts that could have been alleged before. The Amended Complaint added 105 new paragraphs and amended dozens of existing paragraphs. Of the new and amended paragraphs, 124 allege jurisdictional facts unrelated to the 2019 Decision, including Plaintiffs' understanding of the Jones Act, Am. Compl. ¶¶ 21–25,

the alleged binding effect of CBP's letter rulings, *id.* ¶¶ 2–7, 30–40, 49–51, 54–60, Plaintiffs'

theory of reliance and competitive harm, *id.* ¶¶ 41–48, 145–63, 169–75, 182, 185, and Plaintiffs'

characterization of the letter rulings at issue, *id.* ¶¶ 70–83, 94–98, 103–05, 122–32, 136–44.  The

bulk of the new material thus alleges jurisdictional facts that could and should have been alleged

in Plaintiffs' Original Complaint.  And those new jurisdictional allegations directly respond to the

standing, ripeness, mootness, and general justiciability arguments that Defendants raised in their

original motion for judgment on the pleadings.  *See* Dt. No. 18-1 at 9–21.  Further amendment

would indeed be a "third bite at the apple."

As emphasized by this Court in *White*—relied on by Plaintiffs—the Court can and should

deny leave to amend because of "undue delay, . . . repeated failure to cure deficiencies in a

pleading, undue prejudice to the opposition party, and futility of amendment."  *White v. Wash.*

*Metro. Area Transit Auth.*, 303 F. Supp. 3d 5, 8 (D.D.C. 2018).  This Court routinely denies leave

to amend when further amendment would be futile or would cause undue delay to the prejudice of

the defendant.  *See, e.g.*, *Mwani v. Al Qaeda*, 600 F. Supp. 3d 36, 49–50 (D.D.C. 2022).  Prejudice

includes not only the litigation costs imposed on the Defendants but also the unnecessary

"expenditure of additional resources by the Court."  *Id.* (quoting *Hallissey v. Am. Online, Inc.*,

No. Civ. A. No. 99-3785, 2009 WL 2222739, at *2–3 (S.D.N.Y. July 15, 2009)).

As demonstrated above, Plaintiffs have not cured the jurisdictional defect at the heart of

their claims.  Plaintiffs ask for an advisory opinion rather than a resolution of any particular case

or controversy.  Plaintiffs could salvage their claims only by fundamentally changing them—a

radical change in the scope of the case that cannot be effected through amendment of a complaint.

*Miss. Ass'n of Cooperatives v. Farmers Home Admin.*, 139 F.R.D. 542, 544 (D.D.C. 1991).

Amending the complaint once again would therefore be futile.  Moreover, further amendment

would unduly prolong this case, which has been pending for five and a half years already.  Further litigation expenses would prejudice the Defendants and waste the Court's resources.  *See id.*; *see also Mwani*, 600 F. Supp. 3d at 50.  The Court should dismiss without granting leave to amend.

## <u>CONCLUSION</u>

For the reasons set forth above and in Defendants' Memorandum in Support of Defendants' Motion for Judgment on the Pleadings, the Court should dismiss Plaintiffs' First Amended Complaint without granting leave to amend.

May 22, 2023

MATTHEW M. GRAVES
(D.C. Bar No. 481052)
United States Attorney
BRIAN P. HUDAK
Chief, Civil Division


By: /s/ *Brenda A. Gonzalez Horowitz*
BRENDA A. GONZALEZ HOROWITZ
Assistant United States Attorney
U.S. Attorney's Office, Civil Division
601 D Street N.W.
Washington, D.C. 20530
Tel.: (202) 252-2512
Brenda.Gonzalez.Horowitz@usdoj.gov


*Counsel for United States Customs and
Border Protection and Troy Miller*

Respectfully submitted,

/s/ *Jonathan D. Brightbill*
JONATHAN D. BRIGHTBILL
(D.C. BAR No. 483956)
CONSTANTINE G. PAPAVIZAS
(D.C. BAR NO. 388403)
Winston & Strawn LLP
1901 L Street N.W.
Washington, D.C. 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
jbrightbill@winston.com
cpapavizas@winston.com

MICHAEL J. WOODRUM
(Tex. Bar No. 24121899)
*Admitted Pro Hac Vice*
Winston & Strawn LLP
2121 North Pearl Street, Suite 900
Dallas, TX 75214
Tel.: (214) 453-6500
Fax: (214) 453-6400
mwoodrum@winston.com

*Counsel for Intervenor–Defendant API*